## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

NINA WATSON, M.D.,

     Plaintiff,

v.                                  Case No.:

TELEMAMMOGRAPHY SPECIALISTS,
LLC,

     Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiff, Nina Watson, M.D. ("Dr. Watson" or "Plaintiff"), sues Defendant, Telemammography Specialists, LLC ("TMS," or, "Defendant"), and in support thereof alleges as follows:

### INTRODUCTION

1.     This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing and fraudulent misrepresentation.

2.     Dr. Watson is a board-certified diagnostic radiologist with a subspecialty fellowship training in breast imaging. Dr. Watson is licensed to practice medicine in 14 states, including the state of Florida. Dr. Watson often works as a travel physician and independent contractor, engaged in identifying and eliminating disparities in breast cancer screening and diagnosis via remote  teleradiology/telemammography breast imaging services.

3.     TMS is in the business of providing professional telemammography services for imagining facilities throughout the United States, including Florida. TMS provides contracted facilities with licensed radiologists who perform their duties on an independent contractor basis,

4884-7759-0326.3

like Dr. Watson, and then TMS receives fees from the contracted facilities in return. With respect to how independently contracted radiologists like Dr. Watson are paid, TMS provides a set schedule of fees to be paid dependent on the type of read (breast ultrasound, bilateral breast MRI, etc.) performed by the physician. TMS also controls which independently contracted radiologists receive mammographies to read, how many and how often. In other words, TMS completely controls the workflow of its independently contracted radiologists like Dr. Watson.

4. TMS began recruiting Dr. Watson in the summer of 2022 to sign an agreement with it that would compensate Dr. Watson on a per read basis, dependent upon the type of diagnostic imaging she was required to review. During initial discussions, Dr. Watson expressed concerns to TMS regarding the pay structure, as she would not enter into an agreement that would provide her with less income than she was already regularly receiving.

5. In an effort to induce Dr. Watson to enter into an Agreement, TMS promised Dr. Watson a minimum of 70 readings/day which would guarantee her an income of $2,5000.00/day. TMS promised Dr. Watson a minimum of 70 readings/day, although it knew that said volume was impossible to deliver. *See* **Exhibit A**.

6. After signing the agreement, TMS, on average provided Dr. Watson with 16 readings a day, which amounted to approximately 20% of the guaranteed income TMS promised Dr. Watson. To add insult to injury, TMS materially breached the agreement between the parties in various ways, including but not limited to: i) providing inadequate information technology services which severely affected Dr. Watson's ability to provide proper service to patients; ii) failing to follow required and proper standards of care; and iii) then terminating the agreement without cause absent the required 90 day notice.

7.      With respect to the information technology services, TMS represented to Dr. Watson that there were technical issues with her computer, internet, firewall, VPN and/or a combination of all of the aforementioned. TMS asked that Dr. Watson make her personally owned workstation available for third-party diagnostics and inspections to ensure that there were no problems on her end. TMS checked Dr. Watson's hardware, internet, VPN etc. on several occasions but could not find any issues on her end. After days of failed workarounds on the part of TMS, Dr. Watson had her own independent third-party verify that there were no issues on her end. The tests conducted showed that that the technical issues were in fact caused by TMS' *See* **Composite Exhibit B**.

8.      Despite this, TMS continuously interrupted Dr. Watson's work day to perform "diagnostics" or "troubleshoot" the technology issues which arose through no fault of Dr. Watson. On, September 6, 2022, in complete violation of the Agreement's terms, which required 90 days termination notice in instances without cause, TMS sent Dr. Watson a termination letter citing technology issues – which were of TMS' own making. *See* **Exhibit C**.

9.      Dr. Watson now brings this action to recover compensatory damages, lost profits, attorneys' fees, costs, funds expended to perform under the agreement and punitive damages in an amount no less than $195,140.00.

**PARTIES, JURISDICTION, AND VENUE**

10.      Plaintiff is an individual *sui juris* who resides in Broward County, Florida, holds a Florida medical license and performs work in Broward County, Florida.

11.      Defendant TMS is a Georgia limited liability company whose publicly listed business address in located in Decatur, Georgia.

12.     This Court possesses subject-matter jurisdiction under 28 U.S.C. §1332 (a)(1) because the parties are completely diverse and because the amount at issue here exceeds $75,000.00, exclusive of interest and costs.

13.     This Court can assert *in personam* jurisdiction over TMS because doing so comports with Florida's long-arm statute by virtue of Defendants' reaching into Florida to regularly conduct business (TMS regularly contracts with Florida physicians to provide services inside the state of Florida, including but not limited to Dr. Watson), by soliciting Dr. Watson's business, by requiring Dr. Watson to perform her professional duties for Florida residents, by requiring Dr. Watson to obtain a Florida medical license, by committing tortious conduct in Florida, among other things. Defendant TMS satisfies the minimum contacts test for the same reasons.

14.     Venue is proper in the Southern District of Florida pursuant to Title 28 U.S.C. §1391 because Plaintiff resides in this district, her principal place of business is in this district and a substantial portion of the events or omissions giving rise to the claims occurred in this District.

15.     All conditions precedent to the filing of this action have been performed, satisfied, or waived.

### GENERAL ALLEGATIONS

16.     At the behest of Martha Garrison, on or around June 17, 2022, Daniel Hickman of MedAtlantic contacted Dr. Watson to gauge her interest in remote telemammography work with TMS. Dr. Watson expressed interest but stated that her acceptance of a position would be contingent upon a high volume of reads, to guarantee a minimum monthly income level. To that effect, Daniel Hickman, told Dr. Watson that there would be "Plenty of volume for you…". *See* **Exhibit D**

17.     On or around June 22, 2022, Martha Garrison, the owner of TMS reached out to

Dr. Watson, after explaining that she was referred to contact Dr. Watson through Daniel Hickman

of MedAtlantic, to recruit her to provide professional telemammography services for imagining

facilities throughout the United States, including Florida. *See* **Exhibit E**.

18.     After email communications, Dr. Watson became interested and took a call with

Martha Garrison to discuss the terms of working with TMS and to make clear Dr. Watson's

compensation requirements. During this call, Martha Garrison explained that Dr. Watson would

be compensated on a per read basis and that TMS had an enormous amount of volume.

19.     Dr. Watson was explicitly clear with Martha Garrison that she was uninterested in

any type of working relationship that would make her less than $2,500/day. In an effort to induce

Dr. Watson to enter into an agreement with TMS, Martha Garrison promised Dr. Watson a,

"minimum of 70 reads per day" which would render Dr. Watson at least a $2,500/day income.

Martha Garrison promised Dr. Watson at least 70 reads per day although she knew that TMS did

not have the ability to fulfill this promise.

20.     Martha Garrison's purposeful deception of Dr. Watson on behalf of TMS, is

consistent with TMS' pattern of unfair and deceptive trade practices that it takes in an attempt to

secure an unearned market advantage.

21.     As a medical staffing agency, both doctors (Dr. Watson for example) and hospitals

are consumers of TMS placement services. TMS works as the middle man placing work from

hospitals with doctors. TMS benefits by securing as many doctors with as many state licenses as

possible for contracted periods of time, because that way, TMS can in turn advertise to hospitals

that it has a wide and extensive network of doctors to handle large workloads throughout the

country.

22.     Dr. Watson's services are in extraordinarily high demand nationwide, so working with TMS was not one of Dr. Watson's only options. TMS was competing against many similar companies which provide the same services and excellent compensation packages.

23.     Martha Garrison and TMS' knew that without promising Dr. Watson her requested compensation package that her professional services would not be able to be secured. Absent TMS intentional misrepresentation, Dr. Watson would not have entered into any agreement with TMS.

24.     Based on Martha Garrison and TMS' purposeful misrepresentation to Dr. Watson, she entered into the Agreement to provide telemammography services on behalf of TMS on July 11, 2022. *See* **Exhibit A**.

25.     Pursuant to Section 8.1 of the Agreement, "Either party shall have the right to terminate this Agreement without cause upon ninety (90) days prior written notice." *See* **Exhibit A**.

26.     In preparation for providing services under the Agreement, Dr. Watson spent upwards of $3,000.00 in out of pocket expenses, including but not limited to Three Palm software, Dragon voice dictation software, among other necessities required by TMS.

27.     Once acquired, a TMS contracted IT specialist named "Rob" began setting up Dr. Watson's workstation so that she could perform services under the agreement. During the set up process, Dr. Watson also had to allow Three Palms IT Specialists to access her workstation as well. When Rob would need access to Dr. Watson's computer he would need to do so remotely. This was extremely sensitive not only because Dr. Watson's workstation was owned by her and cost in excess of $30,000.00, but because the computer hard drive and files contained therein had many sensitive documents, including those protected by HIPAA. In addition, while Rob or any

other IT specialist was troubleshooting or performing any services to the software or security features required by TMS, Dr. Watson could not perform any work.

28.     Within the first several weeks it became clear that TMS could not deliver the promised 70 readings per day and had a host of technological issues which exacerbated matters.

29.     On August 2, 2022, Lindy Minore of TMS, responded to Dr. Watson's inquiry to her regarding the lack of readings she was receiving and the technology issues. Dr. Watson, stated that "I am trying to find the right rhythm of pushing the images to you…" and then promised Dr. Watson an additional 30 screens by the end of her shift, *at least 50* for her following shift, and then suggested some workarounds for the Three Palms software. *See* **Exhibit F**.  Unfortunately, TMS' false promise was not fulfilled.

30.     After a little longer than a week with no improvement to the promised number of readings that she received, Dr. Watson reached out to TMS once again to address the issue. In response, Martha Garrison, followed up with Dr. Watson on August 11, 2022 by text, again reaffirming her promise to give Dr. Watson at least 70 readings: "You should have received a lot of screeners to read today. I told Lindy to give you at least 70 mammos today." *See* **Exhibit G**.

31.     Not only was there a complete and purposeful miscommunication on the part of TMS with respect to the number of readings Dr. Watson would receive, her work and off days were repeatedly interrupted by TMS and Three Palms IT staff to work on "technological issues". Any time either party worked on Dr. Watson's workstation remotely, she would have to stop, save her files in draft and then wait until the IT specialist was complete to resume her work hours later.

32.     TMS staff often accessed Dr. Watson's workstation remotely without her permission. This caused numerous issues, including but not limited to causing Dr. Watson to lose work she had begun, software and hardware settings on her sensitive workstation would be altered

without her permission and in some instances hardware would stop working altogether. *See* **Composite Exhibit H**.

33.     Upon information and belief, once Dr. Watson's initial follow up with TMS regarding the lack of readings, TMS used "technological difficulties" as a smokescreen to cover its refusal to provide Dr. Watson with 70 readings a day and as a covert form of harassment to induce her to terminate the Agreement between the parties.

34.     TMS required access to Dr. Watson's workstation or accessed her workstation on a repeated basis from late July through August. *See* **Composite Exhibit H**. Some days, TMS would request to access Dr. Watson's personal work station multiple times in a day. **Id**. Every time TMS required access, Dr. Watson would have to stop reading scans and sometimes was delayed for hours ***with no compensation*** – which TMS knew and did purposefully. TMS would often, "coincidentally" request access to Dr. Watson's computer when they knew she was scheduled to be on duty reading. **Id**. There were also times, despite Dr. Watson's prior warning not to, that TMS would access her workstation without permission causing her to lose drafts of scans that she was working on and interfering with her workstation settings. **Id**.

35.     TMS' repeated requests to access Dr. Watson's workstation, despite the fact that all independent third-party tests she had conducted showed that her internet and system was fine, led Dr. Watson to have serious concerns regarding TMS' intentions. At one point, someone at the behest of TMS and without Dr. Watson's permission, contacted her internet provided and attempted to change the settings. Dr. Watson developed the legitimate belief that TMS would intentionally or had been intentionally disrupting her workstation and or its ability to receive readings through the third-party software installed at TMS behest, as a means of retaliation and/or to cover up the fact that TMS either did not have the ability or desire to fulfill its promise to Dr.

Watson to provide her with a minimum of 70 readings per day. Often, Dr. Watson would return to her workstation to find that screeners assigned to her queue would be removed without any explanation. Upon questioning, TMS' representatives would state that her workstation was offline when it was not. *See* **Exhibit J**.

36.     To add insult to injury, TMS had tremendous issues with respect to standard of care concerns. Often, TMS' had limited or no access to a patients current and prior imaging, ultrasounds and pathology reports – which put the patients at risk and prevented Dr. Watson from providing optimal service. *See* **Exhibit I**.

37.     Based on TMS, actions and its refusal and or inability to send Dr. Watson the promised number of readings, her average total dropped to 16 screenings per day and income per hour fell to $20/hr. Therefore, on August 23, 2022, consistent with Section 8.1 of the Agreement, Dr. Watson gave TMS her 90 day notice of termination.

38.     The following two weeks consisted of a continuation on the part of TMS to-under deliver on the number of screenings given to Dr. Watson. Finally, on September 6, 2022, TMS' terminated the Agreement, without cause effective immediately with Dr. Watson due to "technology issues" – TMS actions constitute a material breach of Article 8 of the Agreement, as TMS was not terminating the relationship for cause. *See* **Exhibit C**.

39.     On or around September 6, 2022, Dr. Watson sent TMS a formal demand seeking the $195,140.00 in compensatory damages and lost profits, not including attorneys' fees, costs and funds already paid. On or around September 16, 2022, TMS sent a formal letter rejecting Dr. Watson's demand.

40.     All conditions precedent prior to bringing to this action have been performed, occurred, satisfied, waived, or excused.

## COUNT I – Breach of Contract

41.     Plaintiff adopts and realleges the allegations contained in paragraphs 1 – 40 as if fully stated herein.

42.     On July 11, 2022, the parties entered into a binding and enforceable contract. *See* **Exhibit A**.

43.     Pursuant to the Agreement, Dr. Watson was to provide professional telemammography services as an independent contractor, on behalf of TMS and TMS was to provide Dr. Watson with mammography screenings to read.  Further, pursuant to Article 8 of the Agreement, any party could terminate the Agreement without cause with 90 days' notice.

44.     Defendant breached the Agreement by failing to provide the contractually required 30-days' notice to Plaintiff; then refused to compensate Plaintiff for the services she had contracted to perform, in further breach of the Agreement.

45.     In addition, Defendant also breached the Agreement by failing to provide adequate technology and/or systems that it had contractually promised Dr. Watson which would allow her to perform her professional services.

46.     Defendants breach of the Agreement with Plaintiff has directly and proximately caused Plaintiff to suffer damages, including but not limited to, lost profits, compensatory damages and for work that Plaintiff would have otherwise accepted or had to forego absent Defendant's breach.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and award damages, including those for lost profits, compensatory damage, pre and post judgment interest and all other relief this Court deems just and proper.

## COUNT II – Breach of Implied Covenant of Good Faith and Fair Dealing

47.     Plaintiff adopts and realleges the allegations contained in paragraphs 1 – 40 as if fully stated herein.

48.     On July 11, 2022, the parties entered into a binding and enforceable contract. *See* **Exhibit A.**

49.     Pursuant to the Agreement, Dr. Watson was to provide professional telemammography services as an independent contractor on behalf of TMS and TMS was to provide Dr. Watson with screenings to read. TMS had full control and autonomy of which screenings Dr. Watson received and when. *See* Exhibit A at Section 1.1. Further, pursuant to Article 8 of the Agreement, any party could terminate the Agreement without cause with 90 days' notice

50.     Based upon the Agreement Dr. Watson was required to work a minimum of three days per week, covering live screenings 5 hours on days worked.

51.     TMS breached the covenant of good faith and fair dealing by failing (whether intentionally or simply due to TMS technology issues as referenced *supra*) to provide Dr. Watson any meaningful number of readings during the days she worked. TMS also breached the covenant of good faith and fair dealing by cancelling the agreement without the requisite notice and citing technological issues as the reason, despite the fact that TMS was responsible for the issues.

52.     To the extent Defendant's behavior is not an explicit and express breach of the Agreement, TMS' conduct is a breach of the implied covenant of good faith and fair dealing.

53.     As a direct and proximate results of Defendant's actions, Plaintiff has suffered and will continue to suffer damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and award damages, including those for lost profits, compensatory damages, pre and post-judgment interest and all other relief this Court deems just and proper.

**COUNT III – Fraudulent Misrepresentation**

54.     Plaintiff adopts and realleges the allegations contained in paragraphs 1 – 40 as if fully stated herein.

55.     On July 11, 2022, the parties entered into a valid and enforceable contract, the Agreement.

56.     During the course of negotiations between Plaintiff and Defendant, Dr. Watson was explicitly clear with Martha Garrison that she was uninterested in any type of working relationship that would make her less than $2,500/day. In an effort to induce Dr. Watson to enter into an agreement with TMS, Martha Garrison promised Dr. Watson a "minimum of 70 reads per day" which would render Dr. Watson at least a $2,500/day income. TMS and Martha Garrison promised Dr. Watson at least 70 reads per day although she knew that TMS did not have the ability to fulfill this promise.

57.     Defendant was fully aware that the representation was false.

58.     Defendant's fraudulent statements were intended to induce Plaintiff to enter into the Agreement and provide her medical services.

59.     Defendant's statements and actions caused damage to Plaintiff as Plaintiff acted in reliance upon Defendant's misrepresentations and set her schedule (as well as forewent other equally high paying opportunities for the time period) aside to perform the services pursuant to the Agreement.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and award damages, including those for lost profits, compensatory damage, pre and post judgment interest and all other relief this Court deems just and proper.

Dated: December 8, 2022

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
*Counsel for Plaintiff*
110 Southeast Sixth Street, Suite 2600
Fort Lauderdale, Florida 33301
Telephone:   (954) 728-1280
Facsimile:   (954) 678-4090
E-Service: ftlemaildesig@lewisbrisbois.com


By: *s/Ishmael A. Green*
        Steven Holtzman (FBN: 339334)
        steven.holtzman@lewisbrisbois.com
        Ishmael A. Green (FBN: 109100)
        ishmael.green@lewisbrisbois.com
        linda.yun@lewisbrisbois.com

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Nina Watson, M.D., declare as follows:

1.      I am the Plaintiff in the present case and a citizen of the United States and a resident of Broward County, Florida.

2.      I have personal knowledge of myself, activities and intentions, including those set out in the foregoing Verified Complaint and if called on to testify I would competently testify to the matters stated herein.

3.      I verify under penalty of perjury under the law of the United States of America that the factual statements in this Verified Complaint concerning myself, my activities, and my intentions are true and correct as are the factual statements concerning the Defendant, its activities and its intentions.

Nina Watson, M.D.

12/08/2022
_____

Date: